UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : CRIMINAL NO. 1:15-CR-00158 |
| | : |
| SHAUN L. GRAVES,<br>Defendant | : |

*M E M O R A N D U M*

Pending before the Court is Defendant's motion (Doc. 17) to suppress physical evidence and statements. On November 19, 2015, a hearing was held on this matter, and thereafter, the parties expressed their intent to rest on their already filed briefs. (Docs. 18 & 21). Accordingly, this motion is ripe for review.

*I.   Facts*

In consideration of the testimony and exhibits presented at the hearing on this matter, the facts are as follows:

In 2005, Dennis Simmons ("Simmons") joined the Harrisburg Bureau of Police as a Patrolman, and, in 2012, he was promoted to Detective. (H.T. at 2)[1]. As a Detective, Simmons has been involved with the investigation of crimes involving drugs, corruption, and prostitution. (Id. at 2-3). Furthermore, throughout his police career, Simmons has made more than 100 drug-related arrests and approximately 60 arrests involving guns. (Id. at 3). On occasion, Simmons was required to work undercover during investigations. The date Defendant was arrested, October 16, 2014, happened to be one of those occasions. (See id.).

---

[1] This citation is to a copy of the transcript from the hearing held on November 19, 2015, followed by a corresponding page number.

On that date, a little before 6:00 p.m., while the sun was shining and other pedestrians were in the streets, Simmons arrived to the Allison Hills Neighborhood, in Harrisburg, as part of an undercover surveillance team in an ongoing, and unrelated, drug investigation. (Id. at 3, 4, 23, 24, 26). In conducting undercover surveillance on the day in question, Simmons was sitting alone, in plainclothes, in an unmarked, two-door pickup truck. (Id. at 3-4). Since it was a joint investigation with the Pennsylvania Attorney General's Office, however, at least nine other police officers were in the area, in other motor vehicles. (See id. at 3, 24-26, 27). With respect to the Allison Hills Neighborhood, it is a high-crime area, and, as a police officer, Simmons has made multiple gun and drug arrests there throughout his career as a police officer. (Id. at 6).

Around the time that the clock struck 6:00 p.m., while conducting surveillance near the corner of South 14th and Reese Streets, Simmons heard other police officers debating over the police radio whether they had just heard multiple gunshots in a general area due east of his location. (Id. at 5, 30). Once "Agent Pierce" gave her confirmation that the noise was the sound of gunshots, Simmons also heard a description given of two black males walking in his direction, wearing dark colored hooded sweatshirts, from the general area where gunshots were believed to have been heard. (Id. at 5, 6, 27, 28, 31). None of the officers reported seeing anyone, much less either male, firing a gun or in possession of one. Moreover, none of the other officers reported seeing the two males running or walking at an elevated pace. (See id. at 29, 30-31; see also, DX. 2 & 3). Further, at least one officer described the two males as simply laughing and talking with each other, while also looking over their shoulders. (See DX. 3). As well, Simmons had not heard the sound of gunshots. (H.T. at 5, 27, 28).

Within two-and-a-half minutes after hearing this information over the police radio, Simmons saw two black males walking west on Reese Street, in his general direction. (H.T. at 7-8, 31-33, 34). One of those individuals was Defendant, who was wearing a dark-colored hooded sweatshirt. (Id. at 7)  When Simmons saw them, he observed that they were talking with each other and laughing. (Id. at 7, 34-35). Simmons further observed that they were not running or walking at an elevated pace. (Id.). As well, Simmons did not observe any other pedestrians running, even though others were also in the streets engaging in conversations. (See id. at 53).

After initially observing Defendant and his companion, Simmons started driving north on South 14th Street, towards the intersection with Kittatinny Street, believing that they were going to head south on Buckthorn Street. (Id. at 8). Thus, at the intersection with South 14th Street, Simmons turned left onto Kittatinny Street, heading west. (Id.). Then, at the intersection of Kittatinny and Buckthorn Streets, Simmons made another left turn, heading south on Buckthorn. (Id.).

While driving south on Buckthorn Street, Simmons again saw Defendant and his companion walking in the same southwardly direction. (Id. at 8). Simmons now had a view of their backs. Simmons observed that Defendant was walking with a slight gait, favoring the left side of his body. (Id. at 8, 37-38, 42-43). In his experience as a police officer, Simmons observed individuals in high-crime areas concealing weapons, and a gait is a sign that officers are trained to look for in observing whether an individual may possess a concealed weapon. (Id. at 8, 38). Simmons also noticed that Defendant's arms appeared to be a little tense. (Id. at 8-9). This was another peculiar sign based on Simmons' training and experience, in that Defendant could have been using his arms to secure a concealed

weapon. (Id.). Thus, at this moment, Simmons felt as though he had reason to believe Defendant was armed. (See id. at 9, 38).

Following this reaction, Simmons drove past Defendant and Defendant's companion. As Simmons passed them, they stepped to the side of the ally. (Id. at 44, 63). Simmons then made eye contact with Defendant and nodded. (Id. at 9). In response, Defendant raised his arms above his head, in the shape of a "Y,"[2] and Simmons continued driving south on Buckthorn Street. (Id. at 9).

Although the gesture could have had other connotations, at the time, Simmons believed that, based on his training and experience, Defendant's gesture was consistent with a drug dealer's or someone who wanted to conduct an illegal transaction in the streets. (Id. at 10). More specifically, Simmons explained that while the gesture could simply mean "what's up" or could be viewed as a challenge, when people in high-crime areas are looking to conduct an illegal street transaction they will make eye contact with a believed seller, who, in response, will make a gesture signifying something illegal was for sale. (Id.). One of the known gestures is the one Defendant made. (See id. at 47-48).

In total, Simmons observed Defendant and his companion for approximately four minutes. (Id. at 63). After passing them on Buckthorn Street, Simmons' plan was to try and make an illegal purchase from Defendant. (See id. at 10, 44-45). Accordingly, Simmons drove to the intersection at Berryhill Street. (Id. at 10-11). There, Simmons turned the wrong way onto Berryhill and parked the pickup truck he was driving. (Id. at 11). At this juncture, Simmons saw Defendant walking towards the pickup truck without his companion. (Id. at 11, 50, 51). Defendant had also picked up his pace. (Id.). When Defendant got five feet away from the pickup truck, Simmons got out, displayed the badge

---

[2] Simmons demonstrated the gesture during the hearing.

4

he was wearing on a chain around his neck, yelled "Police," and immediately placed Defendant into handcuffs. (Id. at 11-12). Indeed, Simmons did not give Defendant any time to react or resist. As Simmons got out of the pickup truck, he grabbed Defendant, lifted him up, turned him around, and pushed him up against a wall before applying handcuffs. (Id. at 12-13). Simmons acted in such a manner because of his personal observations of Defendant and his companion, what had been reported over the police radio regarding the shots fired, and because of his experience being robbed in other drug deals while working undercover. (See id. at 13, 22, 23). Simmons, moreover, believed that Defendant was potentially approaching him to sell drugs. (See id. at 46).

Within seconds after handcuffing Defendant, other officers arrived to where Simmons was located, and, with Defendant's hands cuffed behind his back, Simmons frisked him, outside of his (Defendant's) clothing.[3] (Id. at 14, 16, 54, 55). The other officers knew Simmons' location because he had been talking with them over the police radio, after he had driven past Defendant on Buckthorn Street. (Id. at 59).

With respect to the pat down, Defendant was wearing a dark-colored hooded sweatshirt, dark pants, and work boots. (Id. at 14). Simmons, through the outside of Defendant's clothing, first felt small, hard objects in a baggie, inside of Defendant's right pants pocket: the right "watch" pocket to be precise. (Id. at 14, 16, 57, 58; see U.S. Ex. 2). As soon as Simmons felt those objects, his training and experience allowed him to determine that the objects were consistent with the feel of crack cocaine. (H.T. at 14-15). Simmons, thus, removed those objects from Defendant's "watch" pocket, recognizing them

---

[3] The motion to suppress is solely concerned with this frisk, the first, when items were seized. According to Simmons, however, he may have later frisked Defendant, for a second time, before placing him into a police vehicle. (H.T. at 58).

5

as being drugs.  (Id. at 15).  Simmons then removed a hard oblong object he had felt in Defendant's "lower" right pants pocket during the frisk.  Upon removing that item, Simmons immediately recognized it as being a .22 caliber bullet.  (See id. at 14-15, 57, 58; see also U.S. Ex. 1).  Simmons thereupon *Mirandized* Defendant.  (H.T. at 16).

When Simmons asked him some questions, Defendant informed Simmons that the .22 caliber bullet was carried around for good luck after his brother had been murdered by a .22 caliber gun.  (Id. at 17).  Defendant also informed Simmons that the substance removed from his pocket was Depakote, a non-controlled substance.  (Id.).  Nevertheless, Defendant said that he was going to sell the Depakote as a non-controlled substance to Simmons.  (Id.).  Defendant did not tell Simmons where any gun could be located.  (Id. at 18).

After answering some of Simmons' questions, "Sergeant Gauch" decided to move Defendant away from where the undercover investigation was ongoing.  (Id.).  Defendant, therefore, was moved approximately two blocks away to 13th Street.  (Id.).  There, Simmons approached Defendant to speak with him again.  (Id. at 18-19).  Before doing so, Simmons re-*Mirandized* Defendant.  (Id.).  At this point, Defendant told Simmons that he was walking with his companion, who was responsible for firing the gunshots in the area.  (Id. at 19).  The other male then gave Defendant the gun.  (Id. at 19, 22).  When asked where the gun was located, Defendant looked down at his left boot and said that it was in there.  (Id.).  Inside that boot, Simmons recovered a loaded .380 automatic pistol and saw that the gun's serial number could barely be read.  (Id. at 19-20, 21; see U.S. Ex. 3 & 4).  When asked how the gun got into his left boot, Defendant replied that it fell out of his pants when he was being handcuffed.  (H.T. at 20-21).  Defendant also told Simmons that

he was approaching the pickup truck to sell Depakote as a controlled substance and that he was going to take Simmons' money.  (Id. at 21-22).

Subsequently, Simmons filed criminal charges against Defendant for carrying a firearm without a license, possessing a weapon as a convicted felon, attempting to sell a non-controlled substance as a controlled substance, and possession of drug paraphernalia.  (Id. at 22).[4]  Thereafter, on July 29, 2015, a Federal Grand Jury returned a two-count indictment against Defendant, charging him with possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B), and the unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and (e).  (Doc. 1).

In moving to suppress the physical evidence and statements, Defendant raises a series of Fourth Amendment arguments, contending that: (1) the stop was not based on reasonable suspicion that Defendant was involved in criminal activity, as required by *Terry v. Ohio*, 392 U.S. 1 (1968); (2) the *Terry* frisk was not supported by reasonable suspicion that Defendant was armed and dangerous; (3) the seizure of the items from Defendant exceeded the scope of a *Terry* frisk; and (4) both the physical evidence recovered and Defendant's statements[5] were fruits of an allegedly unconstitutional search and seizure.  (See Doc. 18).

---

[4] To the extent it is relevant, later lab tests revealed that the substance Simmons recognized as drugs was Depakote.  (H.T. at 22).

[5] Defendant insists that he is not challenging the voluntariness of his statements pursuant to the Fifth Amendment. (Doc. 18 at 12-13; see Doc. 17 at ¶¶ 20-21).

7

## II.   Discussion

### A. The Stop and Frisk

The Fourth Amendment unquestionably prohibits "unreasonable searches and seizures." U.S. CONST. Amend IV.  It is also beyond debate that the Constitution, via the Fourth Amendment, permits police officers to make a brief investigatory stop, i.e. a seizure, for reasonable suspicion that criminal activity is afoot.  *Terry*, 392 U.S. at 30.  Such a detained person may also be frisked, i.e. searched, for weapons if the police have a reasonable suspicion that he is armed and dangerous.  *Id.* at 27; see *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.").

In assessing the constitutionality of a stop and frisk, courts must utilize the reasonable-suspicion framework that requires less than probable cause; however, under this framework, there must be "at least a minimal level of objective justification."  *Terry*, 392 U.S. at 123.  Thus, "the officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000)(internal citations and quotations omitted).  To determine whether an officer had reasonable suspicion, courts consider the totality of the circumstances up until the point of the stop and frisk.  See *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Brown*, 448 F.3d 239, 249 (3d Cir. 2006).   Among the pertinent factors that can be considered to make this determination are: the location, the history of crime in the area, a suspect's behavior, the time of day, the proximity to a reported crime, and the number of persons in an area.  See *United States v. Goodrich*, 450 F.3d 552, 561 (3d Cir. 2006); *United States v. Connolly*, 349 F. App'x 754, 757 (3d Cir. 2009), citing *Johnson v.*

*Campbell*, 332 F.3d 199, 206 (2003)(quoting *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)).  A court must also give due weight to the specialized knowledge or training of the officer.  *Wardlow*, 528 U.S. at 124; see also, *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003).

Absent a warrant, the Government bears the burden of showing that Simmons had reasonable suspicion or that a warrant was not required. See *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992)(citations omitted); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005)).

In resolving Defendant's motion, Simmons observed Defendant walking away from the general area where other officers had just heard gunshots.  In addition, based on his training, experience, other observations, and the high-crime area, Simmons had reason to believe that Defendant may have been armed and otherwise involved in criminal activity.  Indeed, while Simmons was observing, Defendant made a gesture known to signify that something illegal might be for sale.  Not to mention, before he was stopped by Simmons, Defendant picked up his pace and started walking directly towards Simmons' pickup truck, without his companion in tow, as if to actually engage Simmons for a criminal purpose.  As well, it is at the forefront that Simmons ultimately stopped Defendant not long after gunshots were heard by other police officers in the same high-crime neighborhood.  Moreover, coupled with Defendant's direct approach towards Simmons' pickup truck parked on Buckthorn Street and his experiences being robbed in other street transactions while working undercover, Simmons had reason to suspect that Defendant, who was also suspected of being armed, may have been dangerous.  Accordingly, the stop and frisk were constitutionally permissible.  Further, that Simmons immediately placed Defendant into

9

handcuffs, without making any inquiries, does not diminish the constitutionality of the stop, especially since Simmons was alone in a high-crime area when he handcuffed Defendant. See *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995)("There is no *per se* rule that pointing guns at people, or handcuffing them, constitutes [an] arrest."); *United States v. Hensley*, 469 U.S. 221, 235 (1985)(providing that police officers, with reasonable suspicion to believe that an individual suspected of criminal involvement is armed and dangerous, may take measures "reasonably necessary to protect themselves and maintain the *status quo*" when stopping a suspect.).

### *B. Scope of the Frisk*

Defendant also contends that the seizure of the Depakote and live round exceeded the scope of a *Terry* frisk. (See Doc. 18 at 10-12). The purpose of a *Terry* frisk is to search for weapons, and the scope of such a frisk is limited to that protective purpose. See *Terry*, 392 U.S. at 18; *Adams v. Williams*, 407 U.S. 143, 146 (1972). Police officers may nonetheless seize non-threatening contraband detected during a *Terry* frisk "so long as the officers' [frisk] stays within the bounds marked by *Terry*." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). In *United States v. Yamba*, the Third Circuit defined the scope of a "plain feel" search under *Dickerson* and determined that the proper inquiry "is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon." 506 F.3d 251, 259 (3d Cir.), *cert. denied*, 128 S.Ct. 730 (2007). As the *Yamba* panel explained, it is permissible to confiscate non-threatening contraband if "spontaneously discovered during a properly executed *Terry* [frisk]." *Id.* When determining whether the scope of a particular *Terry* [frisk]

is proper, "the areas of focus should be whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *Id.* Thus, if an officer develops probable cause to believe, given his training and experience, that an object is contraband before he eliminates the possibility that it is a weapon, he may lawfully perform a more intrusive search, and if he discovers contraband, he may seize it and it will be admissible against the suspect. *Id.*

Based on the totality of the circumstances, we are satisfied that Simmons had probable cause to believe that the objects he felt in Defendant's "watch" pocket, during the frisk, were contraband at the same moment or before he determined they were non-threatening. Indeed, as we view the evidence, Simmons' initial belief that those objects consisted of contraband – based on his training and experience -- was reached quickly, with minimal manipulation, if any, consistent with a routine *Terry* frisk. Similarly, while a single live round, alone, may not be considered contraband, the totality of the circumstances in this matter also leads to the conclusion that Simmons had probable cause to believe that the single round, found after the suspected drugs, was contraband. Furthermore, there is no evidence in the record demonstrating that such a belief was formed by Simmons *after* he determined the live round was not a weapon. Consequently, we find that the frisk did not exceed the scope of *Terry*.

### III.   Conclusion[6]

Defendant's motion to suppress will be denied.  Simmons had reasonable suspicion to stop and frisk Defendant pursuant to Terry.  Furthermore, the *Terry* frisk in this matter did not exceed the scope of *Terry*.  An appropriate Order will be issued.

/s/ William W. Caldwell  
William W. Caldwell  
United States District Judge

---

[6] Since we ultimately conclude that Simmons had reasonable suspicion to stop and frisk Defendant pursuant to *Terry,* and that the scope of the *Terry* frisk was not exceeded, we dispense with a discussion of whether physical evidence, including Defendant's statements, should be suppressed as fruits of a poisonous tree.